ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 16 2015

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ex rel. LATASHIA HAWKINS ) | |
| ) | |
| STATE OF GEORGIA ) | |
| ex rel. LATASHIA HAWKINS ) | |
| ) | |
| Plaintiff-Relator, ) | **1: 15-CV-4380** |
| ) | Civil Action No: _____ |
| v. ) | Jury Trial Demanded |
| ) | FILED UNDER SEAL |
| OGCC BEHAVIORAL HEALTH ) | |
| SERVICES, INC.; SIGRID Y. ELSTON; ) | |
| CASSAUNDRA GRAY; ) | |
| and DIONNE HUFFMAN, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Relator Latashia Hawkins, on behalf of herself, the United States of

America, and the State of Georgia, brings this action and shows the following:

## JURISDICTION AND VENUE

1.     This action arises under the Federal False Claims Act, as amended, 31

U.S.C. §§ 3729 *et seq.*, and the State False Medicaid Claims Act, Ga. Code Ann.

§§ 49-4-168.1 *et seq.*

2.     This court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 3732(a), 31 U.S.C. § 3732(b), and 28 U.S.C. § 1331.

1

3.     This court has personal jurisdiction over Defendants and is a proper venue

pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1931(b) in that Defendants do or

transact business in this jurisdiction and the violations of the False Claims Acts

described herein were carried out in this district.

## THE PARTIES

4.     Defendant OGCC Behavioral Health Services, Inc. ("OGCC") is a Core

Services Provider for the Georgia Department of Behavioral Health and

Developmental Disabilities ("DBHDD"), offering "a comprehensive range of

services available within the community which provide help and treatment to

individuals who are experiencing emotional and behavioral difficulties, or mental

health problems."

5.     Upon information and belief, OGCC is a Tier 2 Community Medicaid

Provider. OGCC enrolls between 200 and 300 total consumers, all of whom are

beneficiaries of Medicaid or are enrolled with Medicaid Managed Care Provider

WellCare or Amerigroup.

6.     OGCC's principal place of business is 3915 Cascade Rd., Ste. 130, Atlanta,

Georgia 30331.

7.     Defendant Dr. Sigrid Y. Elston, PhD is a licensed psychologist in the State

of Georgia. At all times relevant to this complaint, she and Cassaundra "Cass"

2

Gray were Co-Clinical Directors of OGCC.

8.     Defendant Dionne Huffman is the owner and Executive Director of OGCC.

9.     Relator Latashia Hawkins has worked in healthcare since becoming a certified nursing assistant in 1992 and has approximately 10 years of experience working in medical billing.

10.     Hawkins was hired at OGCC on November 2, 2014 to work at the front desk, but was quickly promoted, in April 2015, to Utilization Representative.

11.     Hawkins's job responsibilities included obtaining pre-approval for treatment "units" for each of the clients, preparing orders for services for the doctors, as well as being the backup biller for Medicaid claims.

12.     Ms. Hawkins was also the primary handler of emails from Dr. Elston containing any forms, client documentation, and instructions that she was sending to OGCC.

13.     Ms. Hawkins also was responsible for preparing "pay grids" that contained client names, dates of service, CPT code of service, number of units billed, and the individual provider, which included her regularly accessing OGCC's electronic health records system.

14.     OGCC terminated Ms. Hawkins's employment on September 30, 2015 for complaining about the unlawful behavior she had witnessed.

3

## THE MEDICAID PROGRAM

15.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes

Medicaid, a federally assisted grant program for the States. Medicaid enables the

States to provide medical assistance and related services to needy individuals.

CMS administers Medicaid on the federal level. Within broad federal rules,

however, each state decides who is eligible for Medicaid, the services covered,

payment levels for services and administrative and operational procedures.

16.     At all times relevant to this Complaint, the United States provided funds

to the States through the Medicaid program pursuant to Title XIX of the Social

Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to

Medicaid recipients are eligible for payment for covered medical services under

the provisions of Title XIX of the 1965 Amendments to the Federal Social Security

Act.

17.     By becoming a participating provider in Medicaid, enrolled providers

agree to abide by the rules, regulations, policies and procedures governing

claims for payment, and to keep and allow access to records and information as

required by Medicaid. In order to receive Medicaid funds, enrolled providers,

together with authorized agents, employees, and contractors, are required to

abide by all the provisions of the Social Security Act, the regulations

4

promulgated under the Act, and all applicable policies and procedures issued by
the State.

18.     At all times relevant to this complaint, OGCC was enrolled in and sought
reimbursement from Medicaid.

19.     Medicaid managed care provides for the delivery of Medicaid health
benefits and additional services through contracted arrangements between state
Medicaid agencies and Medicaid Managed Care Organizations (MCOs) that
accept a set per member per month (capitation) payment for these services.

20.      For purposes of the False Claims Act, MCOs are private entities that have
contracted with the government that service public functions in the
administration of the Medicaid Managed Care program and thus act as officers or
employees of the government.

21.     At all times relevant to this complaint, OGCC was enrolled in and sought
reimbursement from WellCare and Amerigroup.

22.     As, upon information and belief, all of OGCC's clients were Medicaid
beneficiaries, either directly or through an MCO, all claims or billing for services
provided to consumers, including all claims and billing referenced herein, were
presented to Medicaid.

23.   New and existing DBHDD Behavioral Health providers, such as OGCC,

must submit to the state a signed Participation Statement and certification thereof:

> The Georgia Department of Behavioral Health and Developmental
> Disabilities (DBHDD) requires that services be provided according to the
> service guidelines and that the agency will operate in accordance with
> applicable standards, rules and regulations and policies.
>
> By signing below, I hereby certify and attest that my staff, agents,
> contractors, subcontractors, billing agent(s) and I have reviewed and agree
> to comply with the terms and conditions set forth in the applicable DBHDD
> and Department of Community Health (DCH)/ Medicaid Provider
> manuals.
>
> I understand and acknowledge that the policies and procedures manuals
> are amended (generally on a quarterly basis) when either Department finds
> it necessary or appropriate to do so, and that it is my responsibility to check
> periodically for any revisions pertaining to the delivery of or
> reimbursement for services rendered to eligible individuals.
>
> I further understand that failure to abide by either Department's (DBHDD
> or DCH) policies and procedures will result in adverse actions including,
> but not limited to the denial of claims, monetary recoupment, termination,
> suspension of payments, and reduction of reimbursement.
>
> I certify and attest that I have reviewed the entire contents of the completed
> application and that the information provided is accurate and complete. I
> understand that inaccurate, incomplete or omitted data may lead to
> sanctions against me.
>
> **Under applicable state and federal laws, I do hereby affirm that I am the
> authorized agent to complete this document and that the information
> contained herein this document is complete, true, and correct to the best
> of my knowledge. I understand that material misrepresentation and/or
> falsification of any information contained herein shall result in the
> immediate removal of further consideration for participation.**

24.     Upon information and belief, OGCC certified that the information on each claim for payment that it submitted to the Georgia Medicaid program was true, accurate, and complete, and that the claim complied with all applicable Medicaid laws, regulations, and program instructions. *See* 42 C.F.R. 455.18.

25.     Amerigroup Explanation of Payment forms include a "Payee Endorsement Acknowledgement" stating "'I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws.' (42 CFR 455.19)."

26.     42 C.F.R. § 455.19 (as an alternative to 42 C.F.R. § 455.18) requires payer agencies such as Amerigroup and WellCare to include the following statement on checks to payees: "I understand in endorsing or depositing this check that payment will be from Federal and State funds and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws."

## FRAUDULENT SCHEMES

### False Billing for Behavioral Health Assessments and Service Plan Development

27.     OGCC falsely bills for Behavioral Health Assessments (BHA), Reassessments (BHR), and Service Plan Development (SPD) in at least four different ways: (1) by falsifying the amount of time required, (2) by falsifying the location of the treatment, (3) by falsifying the date of treatment for the SPD, (4)

7

and by having non-qualified employees perform the treatment but falsifying records to reflect the involvement of someone qualified.

28. The behavioral health assessment process consists of a face-to-face comprehensive clinical assessment with the individual, which must include the individual's perspective, and may also include consumer-identified family and/or significant others as well as collateral agencies/treatment providers. The purpose of the assessment process is to gather all information needed to determine the individual's symptoms, strengths, needs, abilities and preferences, to develop a social and medical history, to determine functional level and to develop or review collateral assessment information.

29. The service plan development process results in a written, individualized service plan/treatment plan. The plan is formulated through a collaborative process with the individual that includes all necessary treatment and rehabilitative services. The individualized service plan includes the treatment objectives/outcomes, the expected frequency and duration of each service, the type of practitioner providing the service and its location, and the schedule of updates to the individualized service plan.

30. Service plans must be reviewed at least annually or when there is a change in the individual's service needs.

8

31.    Each service plan and subsequent revisions must be authorized by a physician or other licensed practitioner authorized by state law to recommend a course of treatment.

32.    BHAs and BHRs are billed under Procedure Code H0031, and SPD is billed under Procedure Code H0032, each with modifiers for the practitioner level and location.

### Falsifying the Time

33.    OGCC submits false claims reflecting incorrect amounts of time spent on BHAs, BHRs, and SPDs.

34.    In actuality, at OGCC, the entire process of performing a BHA and SPD takes approximately one hour—four 15-minute units—to complete.

35.    OGCC's consumer scheduling reflects exactly that, as new consumers are scheduled for a one-hour assessment, during which both the BHA and the SPD occur.

36.    Nevertheless, no matter how long the BHA/SPD takes, OGCC bills according to a protocol for up to five times more.

37.    Templates used for BHAs, BHRs, and treatment plans were sent by Dr. Elston to the staff at OGCC with instructions to bill according to the protocol.

9

38.     Thus no matter how long they actually take, OGCC bills in the following

amounts:

| BHA | Medicaid | 12 units |
|---|---|---|
|  | WellCare | 5 units |
|  | Amerigroup | 8 units |
| BHR | Medicaid | 8 units |
|  | WellCare | 5 units |
|  | Amerigroup | 8 units |
| SPD (new client) | Medicaid | 8 units |
|  | WellCare | 5 units |
|  | Amerigroup | 8 units |
| SPD (established client) | Medicaid | 6 units |
|  | WellCare | 5 units |
|  | Amerigroup | 8 units |

### *Falsifying the Location*

39.     BHAs and SPDs are usually performed in-clinic.

40.     OGCC routinely bills them as out-of-clinic, under code U7.

41.     Out-of-clinic codes pay a higher amount than in-clinic codes.

### *Falsifying the Date*

42.     At OGCC, BHAs and SPDs were performed on the same date, during the

single hour as described in ¶ 33 above.

43.     The staff at OGCC was trained that if a BHA and SPD were billed on the

same date, the claim would be rejected.

44.     Accordingly, Dionne Huffman instructed Dr. Elston and Cassaundra Gray, who in turn instructed the therapists, to, as a rule, put different dates on the BHA and the treatment plans.

45.     Biller Mignon Clark would then bill according to the dates the therapists documented, and Ms. Hawkins was tasked with checking the pay grids to ensure that the dates of BHA and SPD were different.

46.     The DBHDD Provider Manual for Community Behavioral Health Providers provides that "Individuals access this service [SPDs] when it has been determined through an assessment that the individual has mental health or addictive disease concerns. The Individualized Recovery Plan (IRP) results from the Diagnostic and Behavioral Health Assessments and is required within the first 30 days of service, with ongoing plans completed as demanded by individual need and/or by service policy."

47.     A proper treatment plan could not be developed simultaneous with the assessment, and when additional diagnostic assessments have yet to be performed.

48.     OGCC submits false claims with incorrect dates of performance and generates false supporting records.

**Falsifying the Provider for BHAs and BHRs**

11

49.   When a therapist generates a new client, s/he performs the BHA and SPD

for that client.

50.   Cass Gray does the BHA and SPD for all new consumers who come in as

referrals through "the hotline."

51.   Most of OGCC's clients come via referrals from medical practitioners or

contact OGCC themselves.

52.   In those instances, since at least May 2015, the BHAs and SPDs are

performed by site manager Monique Edwards or paraprofessional Kelly Nelson.

53.   Georgia Medicaid only allows for BHAs and SPDs to be performed by a

Level 3 practitioner or higher, or by a supervised "trainee":

> LMSW; LAPC; LAMFT; Psychologist/LCSW/LPC/LMFT's
> supervisee/trainee with at least a Bachelor's degree in one of the
> helping professions such as social work, community counseling,
> counseling, psychology, or criminology, functioning within the
> scope of the practice acts of the state; MAC, CAC-II, CADC,
> CCADC, GCADC (II, III); CAC-I or Addiction Counselor Trainees
> with at least a Bachelor's degree in one of the helping professions
> such as social work, community counseling, counseling, psychology,
> or criminology (addictions counselors may only perform these
> functions related to treatment of addictive diseases).

54.   WellCare guidelines stipulate that, for the performance of BHAs and SPDs,

"Associate license and licensure track Master's level S/T credentials are

acceptable with adequate documentation of supervision."

55.   Monique Edwards does not qualify as a Level 3 practitioner or as a trainee.

12

56.    Kelly Nelson does not qualify as a Level 3 practitioner or as a trainee.

57.    Gray does not supervise Edwards or Nelson when they perform BHAs or SPDs, nor does any other Level 3 or higher practitioner.

58.    Whenever Edwards or Nelson perform a BHA or SPD for a Medicaid beneficiary, in case there is an audit, OGCC adds "S/T" to the notes for "supervisory/trainee," has Gray sign the notes as if she had supervised, and then bills under a U4 code.

59.    WellCare and Amerigroup, unlike Medicaid, require the submission of the BHA and treatment plan as part of its process of authorizing treatment and units for the consumers.

60.    For WellCare/Amerigroup beneficiaries, OGCC removes any mention from supporting documentation of Edwards or Nelson and falsifies the documents to reflect that Gray performed the services.

61.    OGCC bills the services to WellCare/Amerigroup as a U4 code.

62.    Similarly, from BHRs and SPDs for established clients, OGCC replaces therapists Jameca West and Quatrellyia Jones with Gray.

63.    Relator has firsthand knowledge of the falsification of the BHAs, BHRs, and SPDs as she was frequently asked to take part in the editing process as one of her job requirements.

13

64.     She was frequently vocal to Gray that this was inappropriate, but was required to do it to keep her job.

65.     Upon information and belief, OGCC bills some BHAs, BHRs, and SPDs under a Level 2 as if they were performed by Dr. Elston, but Dr. Elston does not perform these services.

66.     None of these codes allow for telephonic interaction, and she lives in Indiana.

67.     When OGCC bills those services under a Level 2 practitioner code, it routinely also falsely bills them as out-of-clinic.

68.     After a year of therapy or as required, the consumers should receive a behavioral health re-assessments (BHRs) and a new treatment plan.

69.     OGCC, however, performs BHRs every 6 months, regardless of the consumer's needs.

70.     BHRs have the same requirements as BHAs—they must be performed by a Level 3 practitioner or supervised trainee, and they must be performed face-to-face with the consumer.

71.     To be effective, the therapist who had been performing therapy for that particular consumer over the previous 6-12 months should perform the BHR and SPD.

14

72.    Many of the therapists at OGCC balk at performing BHRs and SPDs, in part because OGCC has a policy to dock a therapist's reimbursement if their BHR and SPD are late.

73.    For most of Relator's employment, there were two therapists who created the BHR and SPD for other therapists.

74.    Lakeesha Love performed BHRs and SPDs for her own clients, and also for Aleta Dobbs-Farmer and for Jameca West.

75.    Cass Gray, who is the co-clinical director, performed the BHRs and SPDs for Timothy Shea.

76.    Neither Love nor Gray performed a face-to-face assessment; they simply used the other therapists' progress notes and previous treatment plans.

77.    In other words, a therapist who has never met the client and has no firsthand knowledge of that client's needs or improvements is "assessing" that patient and developing a treatment plan for the next six months.

78.    Additionally, student intern Umeko Favor performed BHRs and put Cass Gray's name on them. They are billed as if Gray performed them, and Favor is paid under the table.

79.    LaKinya Bunkley also performs BHRs which are edited and billed as if Cass Gray had performed them.

80.     Just prior to Ms. Hawkins's termination, OGCC hired two new employees whose primary responsibility is to work with Lakeesha Love to perform all of the BHRs and SPDs.

81.     They do not themselves interact with the consumers (except for Love interacting with her own), but rather use the other therapists' and paraprofessionals' progress notes to draft BHRs and treatment plans.

## Falsifying Consumer Eligibility to Medicaid

82.     When consumers switch from WellCare or Amerigroup to regular Medicaid, OGCC is supposed to simply transfer their insurance information and continue to treat them—they were and remain Medicaid beneficiaries and OGCC's clients.

83.     Instead, OGCC treats them as new consumers, so that they can perform— and bill Medicaid for—unnecessary BHAs and PDAs.

### False Claims and Records for Psychological Testing

84.     OGCC routinely performs psychological tests as part of its initial assessment and a yearly re-assessment for Medicaid beneficiaries.

85.     There is no consideration as to whether such testing is necessary or reasonable; it is routinely performed on all Medicaid patients who will allow it.

86.     OGCC does not perform psychological testing on Amerigroup or WellCare

patients, however, because they pay less than does Medicaid, evincing that the

sole consideration for the testing is financial gain.

87.     As defined by the DBHDD Provider Manual for Community Behavioral

Health Providers:

> Psychological testing consists of a **face-to-face assessment** of
> emotional functioning, personality, cognitive functioning (e.g.
> thinking, attention, memory) or intellectual abilities using an
> objective and standardized tool that has uniform procedures for
> administration and scoring and utilizes normative data upon which
> interpretation of results is based.
>
> **Psychological tests are only administered and interpreted by those
> who are properly trained in their selection and application.** The
> practitioner administering the test ensures that the testing
> environment does not interfere with the performance of the
> examinee and ensures that the environment affords adequate
> protections of privacy and confidentiality.
>
> **This service covers both the face-to-face administration of the test
> instrument(s) by a qualified examiner as well as the time spent by
> a psychologist or physician (with the proper education and
> training) interpreting the test results and preparing a written
> report.**

88.     Dr. Sigrid Y. Elston, OGCC's co-clinical director, allegedly performs all of

OGCC's psychological testing, but she relocated to Indiana some time prior to

Ms. Hawkins starting at OGCC in November 2014, and has lived there ever since.

17

89.     It is not possible that Dr. Elston, while in Indiana, is performing face-to-face testing with OGCC clients in Atlanta.

90.     In actuality, OGCC employee Joey Garmon performs the tests with the client, and then he documents the results in a report.

91.     Garmon has no training as a psychiatrist, psychologist, or medical practitioner that would qualify him to perform psychological testing or for OGCC to bill for testing that he has performed.

92.     Dr. Elston does not participate in or supervise the testing, even by phone.

93.     Once Garmon has completed the test report, he emails it to Dr. Elston in Indiana.

94.     Dr. Elston edits the notes to remove any mention of Garmon and falsifies them to indicate that she herself had performed the testing.

95.     Dr. Elston then sends a scan of the notes to Ms. Hawkins and mails OGCC an original signature page.

96.     OGCC bills the psychological testing under CPT Code 96101, practitioner level 2, as if Dr. Elston had conducted it herself, face-to-face.

97.     This process is repeated for every consumer on a yearly basis, as consumers become re-eligible for testing.

18

98.     Furthermore, OGCC routinely bills the psychological testing for five one-hour units, the maximum amount that can be billed under CPT Code 96101, irrespective of the amount of time it actually took.

99.     In fact, the consumers are scheduled for just a one-hour session.

100.    Moreover, Garmon often has an "assistant" help him with the testing. Upon information and belief, the assistant is actually his daughter.

101.    Moreover, because the psychological testing was routinely performed on all Medicaid patients, it was not unusual for it to be performed before there was even a signed Order for Service from a doctor, which is a requirement to bill Medicaid for psychological testing.

102.    OGCC's claims for psychological testing and their supporting records are false.

### False Claims and Records for
### Diagnostic Assessments

103.    New consumers meet with one of the contract doctors to be assessed and prescribed medication.

104.    Some new consumers do not want medication, however—they just want therapy—and so they refuse to come back to meet with a doctor.

105.    In those instances, a BHA and SPD is performed, and the results are sent to Dr. Elston.

106.    Dr. Elston uses the BHA documentation to create a Psychiatric Diagnostic Assessment (PDA).

107.    The DBHDD Provider Manual for Community Behavioral Health Providers states that PDAs "are completed by face-to-face evaluation of the individual (which may include the use of telemedicine) and may include communication with family and other sources and the ordering and medical interpretation of laboratory or other medical diagnostic studies."

108.    Dr. Elston never conducts a face-to-face or phone evaluation with the client; she solely relies on the information gathered in the BHA and treatment plan.

109.    The PDAs are billed under CPT Code 90792, which may only be used when an initial evaluation is provided by a physician, PA, or APRN.

110.    Dr. Elston does not qualify as a provider who can bill under CPT Code 90792.

111.    OGCC bills the PDAs with the code for an in-clinic or out-of-clinic visit, and not telephonically.

112.    As Dr. Elston lives in Indiana, it is impossible that she could be conducting PDAs with consumers at OGCC or in their homes.

### Additional Fraud by Dr. Elston

113. Dr. Elston also bills for psychiatric treatment for established clients, but does not perform any such treatment.

114. There are five different codes that can be used to bill for psychiatric treatment, depending on the length of service (99211-99215), but upon information and belief, OGCC bills under Code 99214, for a 25-minute session.

115. During the course of her employment, Ms. Hawkins is not aware of Dr. Elston ever having spoken to a client in person or on the phone.

### The APS Audit

116. In April 2015, shortly after Ms. Hawkins was promoted, APS Healthcare—which had been contracted by Georgia DBHDD to perform quality control of Georgia behavioral health care providers—performed an audit of OGCC.

117. Prior to the audit, intern Brittany West and front desk worker Natavia Johnson spent a week going through the client files looking for missing and erroneous documents.

118. To "correct" files, Cass Gray forged Dr. Hill's signature on orders of service, and Gray and Dionne Huffman forged consumer signatures on treatment plans.

119. Cassaundra "Cass" Gray "assisted" with the audit.

21

120.   In so doing, Gray came across 6 or 7 consumer charts where Dr. Elston had

put the wrong dates, evincing that she had not actually performed face-to-face

evaluations of the consumers.

121.   When Gray discovered that 2 of the charts were on the auditors' list to

review, she borrowed a lighter from Natavia Johnson and set off the fire alarm.

122.   While the APS auditors—Brianne Slover and Alisa Monfalcone—evacuated

the building, intern Umeko Favor stayed and fixed the discrepancies that Gray

had discovered.

123.   When Ms. Hawkins asked Gray why she did this, Gray responded that

OGCC would be fined $10,000 for every chart that was not in compliance.

### False Claims for Doctor's Services

124.   CPT Codes 99201-99205 and 99211-99215 are properly used for

"Assessment and monitoring of an individual's status in relation to treatment

with medication," for new and established consumers, respectively.

125.   OGCC's clients meet with a doctor on a monthly basis, who briefly speaks

with them and prescribes them medication.

126.   The doctor's examination generally happens very quickly, often taking

fewer than 8 minutes, because their sole purpose is to determine what

medications to prescribe to the consumer.

127.  Moreover, the physician generally does not even spend much, if any, time speaking with the consumer; rather he relies on the BHA to determine what medications to prescribe.

128.  For this reason, consumers are routinely scheduled at 15 minute increments.

129.  OGCC instructs its front desk workers—including Ms. Hawkins—to falsify the amounts of time that the exams took.

130.  For established consumers, who generally return on a monthly basis, they are instructed to document these examinations as 25 minutes. These visits are then billed under Code 99214.

131.  For new consumers, the front desk is instructed to document the examinations as 40 minutes.

132.  Dionne Huffman regularly made it a point of emphasis to the front desk staff, including Ms. Hawkins, to ensure that these times had been changed and matched the supporting documentation.

133.  Monique Edwards instructs the physicians to leave the examinations times blank on their documentation so that the front desk workers could falsify that information.

23

134.   Dr. Jaswant Chaddha routinely put the actual examination times on his
documentation anyway, so the front desk workers would reprint the first page of
Dr. Chaddha's documentation and "correct" the times themselves.

135.   When Ms. Hawkins first became promoted to Quality Assurance
Representative, she was trained by Dionne Huffman, who told her that OGCC
can only bill Medicaid for one assessment in a single day, whether it's a BHA, a
PDA, or an examination by the doctor.

136.   However, clients sometimes demand to see a doctor during their initial
visit.

137.   When OGCC performs a BHA and doctor's exam on a single day, it falsifies
the supporting documentation and bills the doctor's examination as if it were
performed on a later date.

### Falsifying and Rubber-Stamping Orders for Service

138.   Medicaid requires an order of service by a qualified individual for any
treatment given and billed.

139.   WellCare guidelines state that "It is the responsibility of each
provider/facility to ensure qualified staff is providing services ordered by the
organizations physician and/or licensed clinician. All behavioral services require
an order for service."

24

140.   Some services, such as the BHA, SPD, or family outpatient therapy, may be ordered by a licensed clinician, but others utilized by OGCC, including psychological testing and individual therapy, require an order from a medical doctor, PA, or APRN.

141.   OGCC has contracted with at least three doctors to sign "orders of service" for consumers: Dr. Elliott Goldstein, Dr. Walter Hill, and Dr. Jaswant Chaddha.

142.   A doctor is present at OGCC to meet with consumers approximately two days per week.

143.   In between their visits, OGCC staff converts the treatment plan into an order for service for one of the doctors to sign.

144.   When a doctor came into OGCC, Ms. Hawkins would hand him a stack of orders for service.

145.   She witnessed firsthand that they did not spend any time reviewing them, but simply signed one after another, and she can recall various instances of where they signed up to 50 such orders in mere minutes.

146.   If a doctor was unavailable for a week or two, it was not unusual for the order for service to be signed weeks after the client started receiving treatments.

147.    On at least one occasion, in preparation for the APS audit, at Dionne

Huffman's direction, Dr. Hill simply signed a stack of blank orders of service and

OGCC filled them in later.

148.    When Dr. Hill left OGCC in or about April 2015, there was nobody to sign

the large stack of orders that had been prepared for him.

149.    Dr. Goldstein joined OGCC in May 2015, at which time he was handed the

stack of unsigned orders to sign himself, but he refused, explaining that signing

orders dated before he was even contracted with OGCC was too obviously

fraudulent.

150.    This stack remained at OGCC, unsigned and unfiled, through the end of

Ms. Hawkins's employment more than five months later.

### False Claims for Therapy Not Performed

151.    The therapists and paraprofessionals at OGCC customarily bill for two

visits per week when they only visit clients once per week.

152.    As a part of her job, Ms. Hawkins called consumers to verify how often

someone from OGCC came to see them, and was regularly informed that most

consumers were visited just once a week.

153. In or about July 2015, Beacon Health Strategies was awarded the contract formerly belonging to APS Healthcare as the quality control provider for the state of Georgia.

154. Beacon Health has a reputation for being stricter than APS, and OGCC became concerned that it would attempt to contact their consumers and confirm that consumers were receiving the treatments for which OGCC was billing Medicaid.

155. Dionne Huffman, owner of OGCC, was aware of Ms. Hawkins's prior reports that most consumers were being seen once per week but billed twice per week.

156. When she learned that Beacon Health would be taking on the role of QC for the state, she had some staff members perform a sampling to find out whether the therapists were properly billing.

157. This internal audit confirmed that on numerous occasions, therapists were seeing consumers once a week, but were billing Medicaid for visits two times per week.

158. Upon information and belief, OGCC did not reverse any of the claims for these double-billed therapies.

27

159.    When Ms. Hawkins asked LaKinya Bunkley why she and the other

therapists and professionals did this, Bunkley explained that she did not have gas

money to drive twice to the consumer, nor the time to do so because she was in

school.

160.    Bunkley said that she would spend two hours with the consumer instead of

one, so she was still doing the work and should be able to bill for it.

161.    Bunkley also admitted that she told her clients that if auditors called and

asked how often they had seen her, to tell them twice per week.

### False Statements to Obtain Preapprovals

162.    One of Ms. Hawkins's job responsibilities was to obtain the preapproval for

each consumer's "units", i.e., the amount of therapy that OGCC could provide

and bill WellCare or Amerigroup for.

163.    Usually Ms. Hawkins would use the newly performed BHR to complete a

DBHDD Multipurpose Information Consumer Profile (MICP), which was then

submitted to the MCO to obtain approval for the therapy provided.

164.    In late September, Ms. Hawkins was asked by Monique Edwards to

complete all of October's MCIPs, including for consumers who had not yet had

their BHRs.

28

165.    When Ms. Hawkins asked how she could request preauthorization when the therapy plans had not yet been conceived, Edwards told her to use old BHAs and BHRs to complete the MCIPs.

### Reporting and Retaliation

166.    Ms. Hawkins was frequently vocal about objecting to the fraudulent practices at OGCC to Cass Gray, Monique Edwards, and Dionne Huffman, including but not limited to complaining about BHAs being performed by non-therapists, about billing for examinations by a psychologist who had no interaction with the consumers, about billing for different therapists than those who actually performed the service, and about fabricating the supporting documentation to match the billing.

167.    On September 28, 2015, site manager Monique Edwards requested that Ms. Hawkins ask the biller—Mignon Clark—to bill Medicaid for a BHA and a doctor's examination performed on the same day.

168.    Ms. Hawkins told Edwards that she had been trained by Dionne Huffman that Medicaid required that the BHA and the doctor's exam be billed on different days.

169.    Edwards told Ms. Hawkins to tell Clark to bill it anyway, but Ms. Hawkins refused to help Edwards falsify billing information to Medicaid.

170.   Ms. Hawkins does not know how this consumer was ultimately billed, but because of past experiences, she believes that Edwards had Clark falsify the date of the doctor's exam.

171.   Latashia Hawkins was fired just two days later, on September 30, 2015, by Cass Gray and Monique Edwards.

## COUNT I

### Violation of 31 U.S.C. § 3729 – Federal False Claims Act

172.   Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

173.   As set forth above, Defendants OGCC, Elston, Gray, and Huffman, individually and by and through their agents, officers, and employees, knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

174.   As set forth above, Defendants OGCC, Elston, Gray, and Huffman, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

175.   As set forth above, Defendants OGCC, Elston, Gray, and Huffman conspired to commit a violation of the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

176.   As set forth above, Defendants OGCC, Elston, Gray, and Huffman knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

177.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

178.   The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the Federal False Claims Act, 31 U.S.C §§ 3729-3733, in an amount that will be proven at trial.

179.   The United States is entitled to a civil penalty of between $5,500 and $11,000 as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims and statements.

31

180.    Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II

### Violation of Ga. Code Ann. § 49-4-168.1 – State False Medicaid Claims Act

181.    Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

182.    As set forth above, Defendants OGCC, Elston, Gray, and Huffman, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Georgia Medicaid program numerous false or fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1).

183.    As set forth above, Defendants OGCC, Elston, Gray, and Huffman, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of O.C.G.A. § 49-4-168.1(a)(2).

184.    As set forth above, Defendants OGCC, Elston, Gray, and Huffman conspired to defraud the Georgia Medicaid program by getting false or fraudulent claims allowed or paid, in violation of O.C.G.A. § 49-4-168.1(a)(3).

32

185. As set forth above, Defendants OGCC, Elston, Gray, and Huffman knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the Georgia Medicaid program, in violation of O.C.G.A. § 49-4-168.1(a)(7).

186. Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages.

187. The State of Georgia is entitled to treble damages based upon the amount of damage sustained by the State of Georgia as a result of the aforementioned violations of the State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1, in an amount that will be proven at trial.

188. The State of Georgia is entitled to a civil penalty of between $5,500 and $11,000 as required by Ga. Code Ann. § 49-4-168.1 for each of the fraudulent claims.

189. Relator is also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Ga. Code Ann. § 49-4-168.2(i).

## COUNT III

### Violation of 31 U.S.C. § 3730 – Retaliation

190. Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

191. CCC and Huffman violated Relator Hawkins's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against her for lawful acts done by her in furtherance an action under the False Claims Act and other efforts to stop one or more violations of the False Claims Act.

192. As a result of Defendants' actions, Relator Hawkins has suffered damages in an amount to be shown at trial.

## COUNT IV

### Violation of Ga. Code Ann. § 49-4-168.4 – Retaliation

193. Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

194. OGCC and Huffman violated Relator Hawkins's rights pursuant to Ga. Code Ann. § 49-4-168.4 by retaliating against Relator Hawkins for lawful acts done by Relator Hawkins in furtherance of an action under this section, including efforts to stop one or more violations of the state False Medicaid Claims Act.

34

195.    As a result of Defendants' actions, Relator Hawkins has suffered damages

in an amount to be shown at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment:

(a) awarding the United States treble damages sustained by it for each of

the false claims;

(b) awarding the United States a civil penalty of $11,000 for each of the

false claims and statements;

(c) awarding the State of Georgia treble damages sustained by it for each of

the false claims;

(d) awarding the State of Georgia a civil penalty of $11,000 for each of the

false claims;

(e) awarding Relator 30% of the proceeds of this action and any alternate

remedy or the settlement of any such claim;

(f) awarding Relator special damages resulting from the retaliation

pursuant to 31 U.S.C. § 3730(h) and 49-4-168.4;

(g) awarding Relator her litigation costs and reasonable attorney's fees;

and

(h) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Tel. (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

Faith R. Lynn
Georgia Bar No. 149721
**Hornsby Law Group**
1180 W Peachtree St NW #2220
Atlanta, Georgia 30309
Tel. 404-577-1505
Fax. 404-577-1565
FL@HornsbyLaw.com